Wayson W. S. Wong, Esq.
Law Offices of Wayson Wong
A Professional Corporation
142 Seaton Blvd., Suite 203
Hagatna, Guam 96910
Ph. 475-7448

Attorney for Plaintiff



**FILED**
DISTRICT COURT OF GUAM
JUL 06 2007
MARY L.M. MORAN
CLERK OF COURT

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| FLORENCIA Q. LEWIS, | ) Civil Case No.: 05-00026 |
| Plaintiff, | ) PLAINTIFF'S TRIAL BRIEF; <br> ) CERTIFICATE OF SERVICE |
| vs. | ) |
| UNITED STATES OF AMERICA, | ) |
| Defendants. | ) |

## PLAINTIFF'S TRIAL BRIEF

Plaintiff Florencia Q. Lewis ("Mrs. Lewis"), by and through her attorney, Wayson W. S. Wong, Esq., of the Law Offices of Wayson Wong, A Professional Corporation, provides this Court with her Trial Brief.

This is a medical malpractice case brought pursuant to Federal Tort Claims Act on behalf of a woman who went in to address a perceived kidney blood flow problem and ended up with a permanently paralyzed left arm and hand.

To explain to this Court the facts applicable to this case, Mrs. Lewis provides this Court with excerpts from her May 25, 2007 Confidential Settlement Letter to the Magistrate Judge for this case. The facts are the facts and can and

ORIGINAL

should be the same whether recited in that letter or in this trial brief. As this Court will see, there is a substantial disagreement as to the facts as set forth by Mrs. Lewis and those set forth by the defendant. In terms of the law, Mrs. Lewis has no disagreement with the applicable law as recited by defendant, except the Hawaii law regarding informed consent is applicable and should also be cited to this Court. Mrs. Lewis will do that after her recitation of the facts.

That letter reads in part as follows:

> I represent Florencia Quenga (maiden name) Lewis, a Guam native. She is a 68 year old grandmother. She married Jesse Lewis, who was a senior NCO in the Marine Corps. Together, they served our country by his direct service and her keeping the home fires burning. She retired from working and now lives in Yigo. She looks younger than her years, but one will be distracted and consider her older because of the deformity and disability of her left arm and hand. She is one of the nicest ladies I have met and did not deserve to go through this nightmare.
>
> In August 2002, the doctors at Guam Naval Hospital sent her to Tripler for blood pressure concerns and to be considered for a renal artery stent to improve blood flow to her kidneys. Instead, she ended up with a paralyzed, terribly painful left arm and hand because of permanent nerve damage there. <u>Tripler's failure to timely act killed many of the nerves in her left arm and hand.</u>
>
> \*   \*   \* [relating to settlement]
>
> I.   <u>The Government's Liability</u>
>
> Dr. Manish Varma, the Tripler interventional radiologist, was the doctor whose omission was below the standard of care. He should have recognized the compartment (that compartment is described in the next succeeding paragraph) syndrome that developed when he pulled the needle out of Mrs. Lewis' brachial artery on August 13, 2002. Within at least four hours, he should have called for an orthopedic surgeon or vascular surgeon consult to open that compartment to relieve the pressure on the nerves in that compartment and prevent them from dying.

2

The compartment involved is a small straw like structure in the upper arm. The brachial artery runs through it, together with certain nerves, including the median nerve. Bleeding from that artery into the compartment can cause pressure within that compartment. When the needle or catheter was pulled out of Mrs. Lewis arm on August 13, it left a hole in her brachial artery from which blood flowed out into the compartment and probably into the areas of her upper arm surrounding the compartment. Dr. Varma applied hand pressure to try to stop such bleeding, but he apparently was unsuccessful; and a large hematoma developed in her left upper arm. The pressure of the blood in the compartment acted like a tourniquet that put pressure on the nerves in the compartment. Such pressure reduced and/or prevented oxygen from getting to the nerve cells, and that initially damaged and then eventually killed many of them. To avoid serious permanent injury, a surgeon needed to cut into her arm and then cut into or open the compartment to relieve the pressure to protect the nerves. In this case, that was not done because Dr. Varma should have but failed to recognize this compartment syndrome and therefore failed to call for the appropriate help.

Dr. Patricio Rosa, Tripler's vascular surgeon, confirmed that Dr. Varma was negligent. Dr. Rosa was finally called in to help on August 16, 2002. This was after Mrs. Lewis had been discharged from Tripler and was on her way back to Guam. At the airport, she was denied boarding on the plane because her blood pressure was too elevated. She had to be readmitted to Tripler for that problem. But no one had given her left arm and hand problems and pain the proper attention they deserved. By the time Dr. Rosa saw her, he felt it was too late for him to do anything for her.

The Government's expert is Dr. Darren Schneider. Among the references he relied on was the authoritative article entitled The Medial Brachial Fascial Compartment Syndrome Following Axillary Arteriography" by doctors Bryan E. Tsao and Asa J. Wilbourn in Neurology 2003 (journal), a copy of which is enclosed under Tab 1 in the white folder submitted with this letter (all tab referenced information is in that folder). In that article, after extensive research and investigation, the authors conclude that if the syndrome is discovered and explored (surgically) within 4 hours from the onset of symptoms, the patient is up to "…8.3 times more likely to recover completely than those who are only observed or treated with delayed surgery (performed more than 4 hours from onset of symptoms." See page 1041 of that article.

That is why Dr. Rosa testified it was too late to do anything for Mrs. Lewis at the time he saw her about three days after the onset of her symptoms. But Dr. Rosa said that on the scenario of "You pull out the sheath, a large hematoma develops, there's a loss of sensation in fingers, loss of strength in fingers, and pain that develops, such that narcotic mediation is needed to control it...," that would be a "**fire alarm to call for the vascular surgeon for help**." Again, this is the Government's doctor, not one of Mrs. Lewis' experts. A copy of the excerpt of Dr. Rosa's December 18, 2006 deposition testimony confirming the above and a summary of his entire deposition testimony are together enclosed under Tab 2.

In this case, that scenario or combination of facts clearly existed; but again, Dr. Varma failed to heed the fire alarm.

Who are Mrs. Lewis experts? They are Dr. Mark Miller and Dr. Jerone Landstrom, both Guam doctors.

We were blessed to have Dr. Landstrom share with us his outrage about what happened to Mrs. Lewis at Tripler. I have known him as an advocate against medial malpractice lawsuits, and I fully expected him to be uncooperative about helping Mrs. Lewis with her case. Instead, I was unable to stop him from talking about how badly she had been treated by her Tripler doctor. A copy of my recorded interview of my first conference with him on May 3, 2004 is enclosed under Tab 3. He concurs with Dr. Miller's opinion that essentially, Dr. Varma was negligent.

We were even more blessed to have Dr. Miller come to Guam about one month before our scheduled April 2007 trial (rescheduled to August 7, 2007 by the Government). He is an interventional radiologist like Dr. Varma. He color charted the major events of what happened to Mrs. Lewis and marked those evens in red, yellow and purple. That color chart is enclosed under Tab 4. The color charted events show the events that constitute the "fire alarm" described by Dr. Rosa and confirmed by Dr. Landstrom and Dr. Miller. They show that the sheath or needle was pulled at about 1615 hrs., and a large hematoma almost immediately developed. Strong narcotic pain medication (Fentanyl) was given at 1630, and again (Roxicet) at 1700. Dr. Varma himself noted tingling in the fingers (loss of sensation) at 1700. Some two hours later, at 1915, Dr. Varma noted significant weakness in Mrs. Lewis left hand (strength 2-3/5). Those were the symptoms that should have sounded the fire alarm. But Dr. Varma did not hear it. Instead, he did nothing to treat the compartment syndrome, which was fatal to many of Mrs. Lewis left arm and hand nerves. Please

note that if he had called in the vascular surgeon at 1915, three hours after the onset of symptoms (4 hours is the threshold), Mrs. Lewis probably would have recovered completely from this ordeal.

As indicated, Dr. Miller has been of the opinion that "...Dr. Varma's failure to call in the appropriate specialist, either a vascular surgeon or an orthopedic surgeon, to assess Mrs. Lewis at 1915 hours on 13 August 2002, was below the standard of care for interventional radiologists." In other words, Dr. Varma was negligent. A copy of Dr. Miller's 18 March 2007 medical report containing that opinion (see last paragraph of it) is enclosed under Tab 5. He also testified at his deposition that pursuant to the Tsao journal article described, it was his further opinion that had such been done, Mrs. Lewis would probably have completely recovered. His opinions were given on the basis of reasonable medical certainty and/or reasonable medical probability.

The Government retained Dr. Darren Schneider as its expert. His April 12, 2007 report is enclosed under Tab 6 to show its shallowness. But please note his "References" on page 1, to the Tsao journal article as being authoritative. Furthermore, please note that he totally disregards the very important symptoms of great pain (needing narcotics to control) and the loss of strength, which was the critical sign or symptom for Dr. Miller. When you close your eyes to the facts, you can say just about anything you want; and that doctor did. The Government has major liability problems.

II.  Mrs. Lewis' Injuries and Damages

We filed Mrs. Lewis FTCA claim on August 11, 2004, for $1 million. We set forth the nature and extent of her injuries, treatment and damages to justify that amount. They are again presented in the copy of the excerpt of the FTCA claim to Tripler claims attorney Laura Waterman entitled More Information about Mrs. Lewis' Injuries and Damages enclosed under Tab 7.

Aside from her permanent left arm and hand problems and disabilities, the most significant problem Mrs. Lewis had during the first two years after the negligence was her reflex sympathetic dystrophy. That dystrophy caused excruciating pain. Thank goodness her pain management doctors were able to arrest it; otherwise her life would have been torturous.

Let us bring that information up to date.

But we need to mention that during the first year following her injuries, Mrs. Lewis was extremely dependent on her family to help her with household chores like cooking and cleaning and to look after and care for her daily hygienic care. She remained on strong pain medications to give her some pain relief and to help her sleep.

In the subsequent years and since 2004, Mrs. Lewis primarily has had to rely on using her right arm/hand to perform simple tasks. Because of her left hand's immobility, inevitably, the excessive and continuous use of her right arm/hand has led Mrs. Lewis to feel the [sic] that her right arm being tired and overused. Because of that, she has also experienced pain in her upper back and shoulder areas. She has used over the counter medication such as Tylenol daily to control her bouts with such pain. For many years, she had to sleep on her back because she could not turn because of her left arm problems. That was uncomfortable and sometimes painful. She lost a lot of sleep because of that. Thankfully, now she sleeps much better. However, she continues to have daily a lot of stress in living her life with her ongoing feelings of helplessness and weakness because of the loss of use of her left arm and hand.

Mrs. Lewis cannot do so many things that have required the full use of her two hands. She cannot wear certain types of clothing because she simply cannot put them on. Bathing takes extra time and ability. Opening bottles and jars are very difficult tasks because often she has to use her foot or teeth to help stabilize the object while she twists, turns and/or rips it open with her right hand. She has been curtailed from eating healthy meals and has resorted to quick less healthy meals because she cannot cook very well; she cannot cut or chop anything that requires two hands.

Mrs. Lewis still is embarrassed to attend family functions or social events because of the attention and shame she feels when others look at her deformed left hand. At times, she considers herself as less than a complete person and quietly cries about that.

Mrs. Lewis is also sad about not being able to be totally there for her grandchildren. There are so many things she has wanted to enjoy with them that require two good hands. And also there are so many things that she has wanted again to do for herself, like playing the piano, crocheting, cooking, typing and just fixing her bed. She has lost and will continue to lose so much of the past enjoyment of her life.

> On March 30, 2007, Dr. Landstrom confirmed that her previous pain syndrome (reflex sympathetic dystrophy) has been completely resolved. But as I mentioned, she still has other aches and pains indirectly caused by her injuries. He also mentioned that there had been only marginal improvement of her left hand function. He additionally stated that she <u>may</u> benefit from future tendon transfers and tenodesis that will improve grasping and opposition in the left hand; but Mrs. Lewis is afraid of further painful surgery. A copy of that medial summary is enclosed under Tab 8.
>
> On March 30, 2007, Dr. Landstrom also updated Mrs. Lewis permanent impairment evaluation. It was his medical opinion that there is no hand pathology present that he could provide beneficial treatment for at this time. He assessed her left hand impairment at 90%, left upper extremity impairment at 100% and the impairment of 60% of the whole person in accordance with the AMA Guides to the Evaluation of Permanent Impairment, the most recent edition. He again noted that future related surgery may be needed. A copy of that evaluation is also enclosed under Tab 8, behind Dr. Landstrom's medical summary.
>
> The medial summary and evaluation by Dr. Landstrom confirm Mrs. Lewis permanent disabilities and this letter confirms her continued, pain, emotional distress, problems and loss of enjoyment of life that she probably will suffer until she leaves this world.

In that letter, Mrs. Lewis should have I should have further emphasized the trauma and the pain and suffering she experienced during the surgery Dr. Landstrom performed in September 2003, to cut away the innervated tendons in her ring and baby fingers and graft them into her dysfunctional index and middle fingers to try to give her some use of her left hand. Those things were very significant.

Mrs. Lewis apologizes to this Court because she did not have the time to attach the Tabs referred to in that letter to this trial brief, but she will do that next week as a supplement to this trial brief.

The Hawaii law of informed consent is applicable. It was set forth in Tab 7 referenced above as follows.

> With respect to the lack of informed consent issue, in our August 11, 2004 letter to you, we fully discussed Mrs. Lewis' claim for Dr. Varma's failure to obtain her informed consent to the brachial access. We showed how the facts and the law indicate such failure. You have indicated in your letter that we need a medical expert for that claim. We disagree. Hawaii has adopted a <u>patient-oriented standard</u> that requires health care providers to disclose "what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent decision regarding treatment . . . ." *Carr v. Strode*, 79 Haw. 475, 480, 904 P.2d 489 (1995), citing the seminal case of *Canterbury v. Spence*, 464 F.2d 772, *reh'g denied*, 464 F.2d 772 (D.C.Cir. 1972), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). The Hawaii supreme court recently articulated the standard as follows:
>
> Under the patient standard, expert testimony is not critical to demonstrate the amount of information a patient needs in order to intelligently decide between two treatment options. The decision as to what procedure to undergo is ultimately the patient's; to impose a standard of disclosure dictated by experts would be to undermine the decision-making power of patients in similar situations. Therefore, in proving the element of duty for informed consent purposes, **a patient is not required to produce any expert medical testimony regarding what other reasonable [physicians] would have disclosed under same or similar circumstances**.
>
> *Barcai v. Betwee*, 98 Haw. 470, 484, 50 P.3d 946 (2002) (emphasis and bracketing in original). Despite the lack of necessity of any expert medical testimony regarding what a reasonable physician would have disclosed, we already have it from Dr. Varma. To us, the fact that Dr. Varma specifically included the risk of "permanent nerve damage to the left hand and arm" in his description of the risks that he "supposedly" explained to Mrs. Lewis, shows that he, himself, as a doctor, believed that she should have been advised of that risk. However, the facts clearly indicate that he never advised Mrs. Lewis of that risk.

Mrs. Lewis looks forward to present her case fairly and fully before this Court.

Dated: Hagatna, Guam, July 6, 2007.

_____
Wayson W. S. Wong
Attorney for Plaintiff