ORIGINAL

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 472-7332
Fax: (671) 472-7215

Attorneys for the United States of America

FILED
DISTRICT COURT OF GUAM
JUL 06 2007
MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| FLORENCIA Q. LEWIS,<br><br>                Plaintiff,<br>     vs.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | CIVIL CASE NO. 05-00026<br><br>**TRIAL BRIEF OF THE UNITED STATES** |

## I. STATEMENT OF FACTS

The Plaintiff in this case was successfully treated for a life-threatening cut-off of circulation to her kidney. The Plaintiff had, and still has, long–standing malignant hypertension. That caused the impairment of the circulation to her kidney. In order to save her kidney, she needed a stent placed in the renal artery to manually open her circulation.

Plaintiff was medically evacuated, along with her adult daughter to care for her, to Hawaii where she was cared for by interventional radiologist Dr. Manish Varma and the staff of critical care nurses at Tripler Army Medical Center. In order to treat Plaintiff's failing circulation, Dr. Varma needed to pass a catheter through Plaintiff's femoral artery to place a stent in the artery leading to her kidney. The surgery was done using a wire that passed through the artery. Prior to the procedure, Dr. Varma obtained informed consent from Plaintiff, after

informing her of the purpose, risks, and benefits of the procedure, as well as any alternatives available.

During the femoral catheterization, Plaintiff's renal artery dissected, or tore. There is no dispute that the dissection was a known risk and complication of the procedure, and Plaintiff does not allege negligence in this regard. However, the dissection created an emergency that threatened the viability of Plaintiff's kidney. Dr. Varma had to urgently place the stent through another artery, or otherwise Plaintiff would have required emergency abdominal surgery to revascularize or remove the kidney, with severely increased risk of morbidity and mortality. Plaintiff's complications could have resulted in death. By proceeding with a brachial artery approach, Dr. Varma took the correct action to save the kidney and protect Plaintiff's life.

Plaintiff was sedated for the procedure, and when a different approach became necessary, could not give informed consent for Dr. Varma to use her brachial artery for access. Thus, Dr. Varma went to the waiting area and informed Plaintiff's daughter of the problem, and obtained her consent to proceed through the brachial artery.

After obtaining the daughter's consent, Dr. Varma returned to the operating room and successfully completed the stenting procedure using the brachial artery of Plaintiff's left arm. Following the procedure, Plaintiff was taken to the Intensive Care Unit for monitoring.

In order to perform the stenting procedure required for Plaintiff, it is necessary that the patient receive the anti-coagulant drug heparin. Following the procedure, the heparin dosage is reduced and labs results monitored until the coagulation time is acceptable. During this time, a sheath, which is a type of sleeve used to insert the catheter into the artery, will remain in the artery. Consistent with the standard of care, Plaintiff's heparin was reduced, her coagulation time was monitored and was determined to be normal, and the sheath was removed from her arm on August 13, 2002.

According to the doctor who removed the sheath, and the nurse assisting him, the sheath removal was done correctly and appropriately. Despite this, after Plaintiff's sheath was removed, she began to bleed and developed a hematoma in her upper arm. Dr. Varma was present when the sheath was removed and the hematoma occurred, and responded appropriately by holding pressure to the puncture site. Dr. Varma also performed an ultrasound examination of the site in order to visualize the brachial artery, and determined the bleeding had stopped and that Plaintiff did not have a complication such as a pseudoaneurysm.

The registered nurses caring for Plaintiff in the ICU, Lisa Peddle, RN and MAJ Gerald Ross, RN, continued to closely monitor Plaintiff's vital signs and the condition of her arm. The nurses checked for signs of worsening or re-bleeding of Plaintiff's hematoma. Rather than worsening, over the course of the night and the following day, the hematoma softened. Plaintiff reported that the tingling and weakness she had at first noted in her hand was gone. Plaintiff moved all her fingers. Her pain level improved. Her vital signs were stable. On the morning of August 14, 2002, the ICU nursing note documents "Spontaneous movement to all extremities. Plaintiff states numbness left hand is gone. Denies pain/discomfort." The patient was also "Cooperative, participative affect appropriate ... Cheerful."

Plaintiff was discharged from ICU and prepared to return to Guam. She stayed in Hawaii with relatives for a few days, and did not see the doctor during this time. On August 16 2002, she was denied boarding the aerovac flight to return to Guam because her blood pressure was dramatically elevated. Plaintiff returned to Tripler, where she was admitted to the hospital for blood pressure management.

Dr. Varma again saw Plaintiff while she was hospitalized for her blood pressure. Plaintiff now complained of worsening pain and weakness in her hand. Dr. Varma consulted a vascular surgeon, who did not feel she needed surgery.

Dr. Varma referred Plaintiff for occupational therapy while she was still in Hawaii. Plaintiff was treated by occupational therapist Eileen Itamoto-Gaza. On her first visit, Ms. Itamoto-Gaza noted Plaintiff complained of pain in her left arm. Ms. Itamoto-Gaza noted Plaintiff's rehabilitation potential was good. She provided Plaintiff with a program of home exercises to use when she returned to Guam.

Plaintiff consulted Dr. Jerone Landstrom when she returned to Guam. Dr. Landstrom noted Plaintiff had numbness of the hand and a decreased ability to grasp, but by her first visit on 14 October 2002, was noted to be improving.

Plaintiff now complains that she has severe pain and weakness in her hand. She finds fault with the treating physician and has hired expert witnesses who claim, in retrospect, that the treating physician should have performed further surgery on her arm. They also look to the medical records to claim that the physician 'missed signs' of increasing damage to her arm. In fact, the testimonial and medical record evidence show that Dr. Varma and the attending staff were concerned about the Plaintiff and monitored her diligently.

Subsequent nerve testing shows that Plaintiff has impairment of a single nerve distribution. It is not clear if it occurred as a direct consequence of the arterial puncture or a constriction. Regardless, injury to the nerve from puncture, as well as hematoma, is each a known risk of the procedure, and is a risk that Plaintiff knowingly assumed.

## II. ISSUES OF LAW

### A. SUSTAINING A CLAIM OF MEDICAL MALPRACTICE

Plaintiff's claim is possible because of the United State's waiver of its sovereign immunity under the Federal Tort Claims Act (FTCA).

Hawaii law applies to this claim. Under the FTCA, tort liability is determined by the law of the state where the alleged act of negligence occurred. 28 U.S.C. § 1346(b). When a tort occurs on federal property within a state, the FTCA action is governed by the law of that state.

Morgan v. United States., 709 F.2d 580 (9th Cir. 1983). Under Hawaiian law, in order to make a claim of medical malpractice, a plaintiff must show: "(1) the duty and standard of care; (2) negligent breach of he standard of care; and (3) injuries proximately caused by the negligence." Bynum v. Magno, 125 F.Supp.2d 1249, 1258 (D.Haw. 2000). "(T)he legal standard of care required by doctors is the standard of practice required by their own profession." Weiler, Medical Malpractice on Trial, p.19 (1991) (hereinafter, Weiler).

California Courts have been eloquent in stating the universal standard: "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, diagnosis, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." Bardessono v. Michels, 91 Cal.Rptr 760, 478 P.2d 480 (1970). Therefore liability is not found, nor will a label of "malpractice" be attached to a physician unless "some deviation by the (doctor) from the standard of care that his peers consider appropriate in the situation under review." Weiler, supra, at 25.

In this case the Court will hear from Plaintiff's experts who will retrospectively pick out elements in the medical records that they believe were 'missed' or 'ignored' by the treating physicians. It is anticipated they will state that further surgery should have been performed on Plaintiff's arm. The expert of the United States will testify that Dr. Varma's vigilance and monitoring was exactly what should have been done. The observations by Doctor Varma and the nursing staff all indicated that Plaintiff's hematoma was resolving and surgery was not justified.

//
//
//
//
//
//

## CONCLUSION

Plaintiff's medical treatment by Dr. Varma and the nursing staff at the Hospital complies with the nationally accepted standard of care. While it is unfortunate that Plaintiff sustained injury from a known risk of an invasive procedure, such injury is not the proximate result of any act of negligence.

RESPECTFULLY SUBMITTED this 6th day of July, 2007.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

BY: _____
MIKEL W. SCHWAB
Assistant U.S. Attorney

# CERTIFICATE OF SERVICE

I, FRANCES B. LEON GUERRERO, Legal Assistant, working in the U.S. Attorney's Office, in the District of Guam, hereby certify that a copy of the " United States Trial Brief", Civil Case No. 05-00026, <u>Florencia Lewis v. United States</u>, was served by personal service to the following:

Wayson W.S. Wong, Esq.
142 Seaton Blvd., Suite 101
Hagatna, Guam 96910

Dated: July 6, 2007

_____
FRANCES B. LEON-GUERRERO
Legal Assistant